UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTHEAST ORGANIC FARMING ASSOCIATION OF NEW YORK, NATURAL RESOURCES DEFENSE COUNCIL, and ENVIRONMENTAL WORKING GROUP,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE,<br><br>    Defendant. | Civil Action No. 1:25-cv-01529 (MMG) |

**DECLARATION OF JEFFREY MCMANUS**

I, Jeffrey McManus, hereby declare and state as follows:

1. I am a Federal Legislative Advocate at the Natural Resources Defense Council ("NRDC"). I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

2. NRDC is a 501(c)(3) nonprofit environmental and public health organization with more than three million members. NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment, including to accelerate the transition away from fossil fuels to a clean energy economy.

3. I have worked at NRDC since 2017. My duties include coordinating with members of Congress, their staffers, and other participants in the federal legislative process to advance legislation that aligns with NRDC's goals. I also work with subject-matter experts at NRDC to understand how pending legislation would affect their issues and translate their recommendations into legislative action. A major part of my role is to serve as a conduit between these two groups,

1

ensuring that NRDC's research is legible to a legislative audience and that NRDC's subject-matter experts understand and contribute to the legislative process.

4. In this role, I work on rural electricity issues and lead NRDC's advocacy efforts on two rural clean energy programs: Empowering Rural America ("New ERA") and Powering Affordable Clean Energy ("PACE"). Both programs were enacted as part of the Inflation Reduction Act ("IRA") and are administered by the U.S. Department of Agriculture ("USDA").

5. New ERA provides $9.7 billion in grants and loans for member-owned rural energy cooperatives to invest in clean energy technology that improves the resiliency, reliability, and affordability of rural electric systems, including battery storage and electrical grid upgrades.

6. PACE provides an additional $1 billion in loans for investment in clean energy technology. Though similar to New ERA, PACE expands the pool of entities eligible for funding beyond member-owned rural energy cooperatives. Municipal utilities, state and local governments, and non-profit organizations, for instance, may apply for PACE loans.

7. Since the IRA's enactment, I have worked to ensure that these programs succeed in practice. This advocacy takes several forms: assessing program effectiveness, raising public awareness, working with Congress to explain the programs' benefits and protect the programs' funding from recission, and helping rural energy cooperatives complete funding requirements.

8. In each of these efforts, my team and I relied on USDA webpages, including (1) the webpage for the IRA, (2) the webpage for the New ERA program, (3) the webpage for the PACE program, (4) a landing page titled "New Energy Deployment" that collected information on both programs, including state-by-state fact sheets, and (5) a USDA fact sheet called "How Rural America Benefits from the New ERA Program."

9. These webpages were the only centralized source for detailed information about New ERA and PACE funding, including the names and locations of funding recipients, the types of clean energy projects funded, and the scale of investments. They also included estimates of job creation and emissions reductions resulting from the projects and a quote from each recipient entity that helped identify their spokesperson.

10. On February 6, I learned that all five of these webpages have been removed. Had they not been removed, my team and I would have continued using them to inform our work. Their removal impedes NRDC's ongoing advocacy in several ways.

11. First, my team and I rely on the information in these webpages to assess the effectiveness of the PACE and New ERA programs and ensure that they live up to their promise. As funding has been awarded, my team and I monitor where that money goes and what benefits it brings. This ongoing monitoring allows us to understand how effective the programs are at supporting clean energy projects in rural areas.

12. USDA's removal of the webpages listed in Paragraph 8 inhibits these efforts. These webpages provided comprehensive data on how USDA allocated funds, informing us about the types of clean energy technology investments USDA prioritized and the scale at which projects were implemented. Understanding these facts, in turn, allowed us to evaluate the programs' effectiveness in reducing emissions and creating jobs in rural areas. Removing this information also hinders our ability to identify funding recipients and survey them about their experiences or challenges.

13. Second, we rely on the information in these webpages to raise public awareness of the benefits of the projects funded by the New ERA and PACE programs. Since the programs were enacted, my team and I have highlighted the likely positive effects of the funding, including

expected reductions in emissions and electricity prices. We have continued to underscore these positive effects given the fast-moving public debate on the Trump administration's funding freezes, which have affected both programs.

14. USDA's removal of the webpages listed in Paragraph 8 obstructs those efforts, too. Knowing which projects were funded and how they will create jobs and reduce emissions is critical to our ongoing public education campaign. And it is particularly important in our efforts to inform the public about the importance of these projects in light of the Trump administration's funding freezes.

15. Third, we rely on the information in these webpages to aid our congressional advocacy. In tandem with our public awareness campaign, we have communicated with members of Congress and their offices to explain the benefits of New ERA and PACE funding in their districts.

16. USDA's removal of the webpages listed in Paragraph 8 likewise hampers this advocacy. My team and I used the information on these webpages to find concrete examples of how the programs benefit rural communities and communicate those examples to members of Congress, emphasizing the real-world effects these investments would have in their districts and the value of continued support for clean energy initiatives. The absence of this information limits our ability to provide detailed, district-specific examples, which are crucial for effective congressional outreach.

17. Fourth, we rely on the information in these webpages to help rural energy cooperatives complete funding requirements. As a condition of receiving New ERA and PACE funding, rural energy cooperatives (or other funding recipients) must prepare and maintain Community Benefit Plans—documents that analyze the positive and negative effects of funded

projects on utility customers, neighbors, and other community members. To prepare these plans, cooperatives must engage with members of the communities affected by their funded projects. But many cooperatives are small organizations that lack the capabilities of larger utility companies. Accordingly, my team and I planned to help cooperatives conduct outreach to community members to bolster their Community Benefit Plans. We want to provide this assistance both to facilitate the process for cooperatives and to ensure that each Community Benefit Plan truly reflects the community's views.

18. USDA's removal of the webpages listed in Paragraph 8 thwarts our efforts to contact affected community members so they can participate in cooperatives' Community Benefit Plans. Because these webpages are unavailable, my team and I cannot determine which cooperatives received funding, where the projects are located, or other crucial details that allow us to make these connections. And even if we could make them, USDA's removal makes it harder to educate community members about specific funded projects or Community Benefit Plans generally because we cannot refer them to official agency sources.

19. Finally, my team and I would have relied on the webpages listed in Paragraph 8 to contact and assist cooperatives affected by the Trump administration's funding freezes. Without these webpages, we lack a credible source that identifies all funding recipients in one place, making it challenging to survey them about the impact of the freezes and, if applicable, help them access the money to which they are entitled.

20. I understand that my colleagues across NRDC have similarly used—and intended to continue using—USDA webpages that have been removed to carry out their work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 14, 2025

_____
Jeffrey McManus

6