UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORTHEAST ORGANIC FARMING ASSOCIATION OF NEW YORK, NATURAL RESOURCES DEFENSE COUNCIL, and ENVIRONMENTAL WORKING GROUP,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE,<br><br>Defendant. | Civil Action No. 1:25-cv-01529 (MMG) |

## DECLARATION OF ANNE SCHECHINGER

I, Anne Schechinger, hereby declare and state as follows:

1. I am the Midwest Director of the Environmental Working Group ("EWG"). I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called to testify, I could and would competently do so under oath.

2. EWG is a 501(c)(3) nonprofit, public interest organization whose mission is to empower the public with breakthrough research to make informed choices and live a healthy life in a healthy environment. EWG uses scientific research, public education, and policy advocacy to highlight federal policies and industrial agricultural practices that pose a threat to public health and to the environment. EWG also translates climate science and public information about complicated federal programs, including those administered by the U.S. Department of Agriculture ("USDA"), into accessible, user-friendly educational materials. Through our website and public education efforts, we offer valuable resources to consumers, community activists, Congressional members and their staff, reporters, and academics.

3.     I have worked at EWG since 2014. I am an agricultural economist by training, and I use this expertise to research and analyze USDA's administration of its multi-billion-dollar conservation programs, which have sweeping consequences for farmers, the American economy, climate change mitigation, and environmental health. To carry out this work, I routinely rely on public information published on USDA webpages, including datasets, policy statements, guidance documents, technical reports, and webinars, to track how USDA allocates its funds, to understand USDA's rationales for its funding decisions, and to assess the climate change and other environmental impacts of those decisions. I then translate my findings into accessible data analyses, visualizations, and reports, which support EWG's public education and policy advocacy efforts.

4.     Much of my work focuses on ensuring that USDA's conservation programs pay farmers to implement conservation practices that have proven climate benefits. In 2022, the focal point of this work became the Inflation Reduction Act ("IRA"), which allocated $19.5 billion dollars to USDA's conservation programs. Critically, the IRA mandated that these funds be spent only on conservation practices that directly reduce greenhouse gas ("GHG") emissions or sequester carbon. To implement this mandate, in 2023, USDA formulated and published a Climate-Smart Agriculture and Forestry ("CSAF") Mitigation List, which enumerates conservation practices that are eligible for IRA funding and has since been updated annually.

5.     EWG worked closely with USDA staff after their initial development of the CSAF Mitigation List, at which point we advocated for the inclusion of conservation practices with substantiated climate benefits and for the exclusion of practices with uncertain or nonexistent climate benefits. EWG has scrutinized subsequent iterations of the CSAF Mitigation List, analyzed

USDA's rationales for including or excluding certain practices, and documented USDA's allocation of IRA funds to determine whether USDA is complying with the IRA's mandates.

      6.      In January 2025, EWG published a report analyzing USDA's funding for climate-smart conservation practices that uncovered serious shortcomings and proposed a suite of policy recommendations. For instance, EWG's report demonstrated that, in 2024, nearly half of all IRA funding disbursed through one of USDA's conservation programs—totaling $623.4 million—paid farmers to implement conservation practices that do not have proven climate benefits. In fact, USDA had provisionally included these practices on the 2024 CSAF Mitigation List notwithstanding its failure to quantify the practices' climate benefits—or even develop methodologies for doing so. The January 2025 report also explained that, while USDA had since changed its designation of these practices from "provisional" to "climate-smart" on the 2025 CSAF Mitigation List—and had determined that it would no longer designate any CSAF Mitigation List practice as "provisional"—USDA had not published any new data demonstrating that these practices, in fact, benefit the climate. For this reason, EWG urged USDA to provide more extensive, recent, and data-driven scientific evidence to justify including practices previously designated as "provisional" on the CSAF Mitigation List. In addition, EWG implored USDA to publicize the data underlying its estimates of GHG emissions reductions attributable to each CSAF Mitigation List practice.

      7.      USDA webpages were essential to developing EWG's January 2025 report. For example, when conducting research for the report, I relied extensively on a Natural Resources Conservation Service ("NRCS") webpage called "Greenhouse Gas Quantification and the Inflation Reduction Act." I used this webpage to access a July 2024 presentation in which NRCS, among other things, explained its progress towards developing new GHG emissions reduction estimation

3

methodologies for CSAF Mitigation List practices and previewed opportunities for interested parties, such as EWG, to provide input on NRCS's selection of quantification methods for measuring the climate benefits of CSAF Mitigation List practices. This webpage informed EWG's understanding, detailed in the January 2025 report, that USDA has not yet developed methodologies for quantifying the climate benefits of certain CSAF Mitigation List practices that were previously designated as "provisional." And it provided the basis for our policy recommendation that USDA publicize the data underlying its GHG emissions reductions estimates, given NRCS's commitment to involving the public in its decision-making process for selecting appropriate quantification methods. Thus, this webpage allowed us to criticize USDA's funding decisions and program administration using USDA's own representations about the state of its research and its desire for public input.

8. My research for the January 2025 report also depended on an NRCS webpage entitled "FAQs: Climate-Smart Agriculture and Forestry Mitigation Activities and Inflation Reduction Act Funding." That webpage explained, among other things, NRCS's process for adding or removing conservation practices on the CSAF Mitigation List, NRCS's policy for determining whether a conservation practice may be funded pursuant to the IRA, NRCS's rationale for abandoning the "provisional" practice designation in its 2025 CSAF Mitigation List, and NRCS's methods for collecting input on what should or should not constitute a climate-smart conservation practice. This webpage was an invaluable resource for understanding the standards that USDA purports to apply when determining whether a conservation practice qualifies for IRA funding. It also informed our critique of USDA policy with respect to conservation practices that were previously designated as "provisional." Put simply, this webpage was essential to demonstrating that USDA is not faithfully implementing the IRA.

9. On January 31, 2025, I discovered that these and many other USDA webpages had been removed pursuant to a USDA directive to archive or unpublish climate-change-focused webpages. Were these webpages still available, I would continue using them to inform my research and analysis. Their removal thwarts EWG's public education and advocacy efforts in multiple ways.

10. First, USDA's removal of the FAQs webpage discussed in Paragraph 8 has caused significant confusion about the state of USDA policy with respect to the CSAF Mitigation List, which impedes EWG's ability to hold USDA accountable and advocate for better policy outcomes. While the FAQs webpage discussed in Paragraph 8 has been removed, and USDA has removed other webpages that previously linked to that webpage, a static PDF of a May 2024 iteration of the FAQs is still live. This earlier iteration does not include key changes that USDA subsequently made to the FAQs, including those that informed EWG's January 2025 report, such as USDA's disavowal of the "provisional" designation and its explanation as to why conservation practices previously designated as "provisional" remain on the 2025 CSAF Mitigation List. It is now unclear whether USDA has reverted to endorsing "provisional" practices or reversed changes it made to the standard it applies when assessing conservation practices. This confusion makes it challenging for EWG and other interested parties to effectively provide public input regarding updates to the CSAF Mitigation List, advocacy that will become increasingly important if the Trump Administration's current "funding freeze" on IRA-supported programs is lifted.

11. Second, removal of the webpage discussed in Paragraph 7 impedes EWG's ability to provide detailed information to members of Congress about an IRA-funded program imperiled by the "funding freeze." The GHG quantification efforts detailed on the webpage discussed in Paragraph 7 are funded by the IRA and, as such, are now in limbo. The removal of this webpage—

the only source of recent information about NRCS's progress towards measuring the climate benefits of CSAF Mitigation List practices—makes it harder for EWG to educate decisionmakers about specific ways in which cutting off IRA funds may disrupt efforts to improve federal support for climate-smart conservation practices, including rigorous quantification of their climate benefits.

12. Third, by removing climate-change-focused landing pages, such as NRCS's "Inflation Reduction Act" landing page and USDA's "Climate Solutions" landing page, USDA has made it more challenging for me to locate and trust information on its websites. Since I learned that USDA removed climate-change-focused webpages, I have been able to locate some USDA digital resources that I use in my work—such as conservation practice datasets and data visualizations—but only after expending significant time combing through USDA's websites and plugging queries into a search engine. In other cases, I have only been able to locate what appears to be an archived or static PDF version of a USDA webpage, which may not contain up-to-date information. By introducing confusion and delay into my work, USDA's webpage purge has disrupted my ability to engage in effective and timely advocacy.

13. My colleagues and I also rely on many USDA webpages that discuss or mention climate change and thus are at risk of removal pursuant to USDA's directive. For instance, my work relies heavily on the NRCS Conservation Practices and Greenhouse Gas Mitigation Information dashboard, which cites scientific studies that NRCS says support the inclusion of conservation practices on the CSAF Mitigation List. Should USDA remove this and other climate-change-focused webpages, my efforts to ensure that USDA's conservation practices are supported by recent, data-driven science will be significantly undermined.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this 14th day of March, 2025.

_Anne S_
Anne Schechinger